*Decision will be entered under Rule 155.*

LOUISIANA LAND AND EXPLORATION COMPANY AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16909-87.          Filed June 27, 1989.

*William M. Linden, John W. Leggett, Debra J. Duncan, Judith M. Blissard,* and *Charles D. Tetrault,* for the petitioner.
*Thomas R. Ascher,* for the respondent.

### OPINION

GOFFE, *Judge:* The Commissioner determined a deficiency in petitioner's Federal income tax for the taxable year 1983 in the amount of $16,976,702. The parties have settled all of the adjustments to petitioner's tax liability contained in the statutory notice of deficiency except one. The sole issue to be decided is whether petitioner must, under the provisions of section 1254 of the Internal Revenue Code, "recapture" intangible drilling and development costs (IDC) as ordinary income when it carved overriding royalties out of the working interests it held in oil and gas leases and transferred them to a trust for the benefit of its shareholders. For convenience, unless otherwise indicated, all section

numbers refer to the Internal Revenue Code in effect for the taxable year 1983.

This case was submitted to the Court fully stipulated under Rule 122 of the Court's Rules of Practice and Procedure. The stipulation of facts and accompanying exhibits are incorporated by this reference.

Petitioner and its subsidiaries are an affiliated group of corporations for Federal income tax purposes, petitioner being the common parent. It was incorporated under the laws of the State of Maryland. When petitioner filed its petition, its principal place of business was New Orleans, Louisiana. Petitioner maintained its books and records and filed the consolidated income tax return using the accrual method of accounting.

The outstanding corporate stock of petitioner, during 1983 and for many years prior to 1983, was listed and traded on the New York Stock Exchange and was widely held.

Petitioner, for many years, has been engaged in the exploration for and development, production, refining, and sale of crude oil and the exploration for and development, production, and sale of natural gas. It also actively engaged in the exploration for and production and mining of other minerals such as sulphur, gold, silver, copper, and coal in the United States and several foreign countries.

Petitioner, prior to April 1, 1983, entered into numerous mineral leases as lessee on tracts of land located in Alabama, Florida, Texas, Louisiana, and Federal waters located offshore from the State of Louisiana. Petitioner was not the sole lessee in all of the leases but for simplicity, it is assumed that petitioner was the sole lessee. Petitioner's share of the leasehold interest has no bearing upon resolution of the issue presented for our decision. Each mineral lease provided that petitioner had the exclusive right to explore for, develop, and produce any oil or gas discovered on the leased property. Petitioner likewise had the exclusive obligation under the terms of the mineral leases to explore for, develop, and produce any oil and gas discovered on the leased property.

Each mineral lease provided that petitioner would bear 100 percent of all of the costs incurred in the exploration,

development, and production of the leased property, and petitioner would become owner of all oil and gas produced except for the royalty interest retained by the lessor. The share of oil and gas produced or the share of the proceeds received from the oil and gas produced which was reserved to the lessor was receivable by the lessor free of all costs incurred in connection with the lease.

From January 1, 1976, through April 1, 1983, petitioner incurred substantial IDC with respect to the leases which it held and it properly elected to deduct these costs pursuant to section 263(c), rather than to capitalize them. As a result of its exploration activities, petitioner discovered oil and gas capable of being produced in commercial quantities.

In 1983, the board of directors of petitioner declared a property dividend in the form of units of beneficial interest in a trust which would contain royalty interests. The purpose of the distribution was to enhance shareholder value by placing directly in the hands of the shareholders an economic interest in portions of petitioner's developing and producing properties. Distributions from the trust to the shareholders were free from the corporate level of taxation, and the shareholders, as owners of units of beneficial interest in the trust, could benefit from cost depletion deductions.

The distribution of the property dividend was carried out by creating a trust into which petitioner transferred overriding royalty mineral interests in productive oil and gas properties in which petitioner was the lessee. These properties are described above. Petitioner then distributed to its shareholders as a property dividend units of beneficial interest in the trust. The overriding royalties transferred to the trust were carved out of petitioner's working interests in the mineral leases.

Both before and after the distribution, each of petitioner's leasehold interests was the only "operating mineral interest" in each lease as that term is used in section 614(d) and section 1.614-2(b), Income Tax Regs. After the distribution, only petitioner had the right and the obligation to explore, develop, and operate the mineral leases, and only petitioner had the obligation to bear all of the costs with respect to the properties covered by the mineral leases.

Each overriding royalty which petitioner carved out of the working interests and transferred to the trust was an "economic interest" as that term is defined in section 1.611-1(b), Income Tax Regs., and was a "nonoperating mineral interest" within the meaning of that term in section 614(e) and section 1.614-5(g), Income Tax Regs. As such, the overriding royalties were not "operating mineral interests" within the meaning of section 614(d) and section 1.614-2(b), Income Tax Regs. Neither the trust, as owner of the overriding royalties, nor the shareholders as owners of the units of beneficial interest in the trust, became an "operator" with respect to the mineral properties burdened with the overriding royalties, as the term "operator" is used in section 1.612-4(a), Income Tax Regs.

The Commissioner, in the statutory notice of deficiency mailed to petitioner, determined that when petitioner transferred the overriding royalties to the trust, it had disposed of property pursuant to section 1254 and petitioner must recognize ordinary income in the amount of $25,238,517.

Section 1254, in general, provides that if a taxpayer disposes of "oil, gas, or geothermal property" the taxpayer must treat as ordinary income the aggregate of expenditures it has deducted under section 263 (or other sections not applicable here). In effect, section 1254 amounts to a "recapture" of IDC previously deducted upon disposition of certain property.

The only disagreement between the parties is whether the property which petitioner disposed of is "oil, gas, or geothermal property" as that term is defined in section 1254(a)(3). If the property is not "oil, gas, or geothermal property," petitioner need not recognize ordinary income. If the property is such property, petitioner must recognize ordinary income. If such income must be recognized, the parties disagree on the amount that must be recognized. The Commissioner determined that amount to be $25,238,517. Petitioner's alternative argument computes the amount to be recognized to be $7,980,332.

"Oil, gas, or geothermal property" is defined, insofar as the definition applies to this case, as follows in section 1254(a)(3):

(3) OIL, GAS, OR GEOTHERMAL PROPERTY.—The term "oil, gas, or geothermal property" means any property (within the meaning of section 614) with respect to which any expenditures described in paragraph (1)(A) are properly chargeable.

It is readily apparent that section 614 must be considered in the interpretation of section 1254(a)(3). In addition, it must be kept in mind that the definition is applied only to the disposition of "oil, gas, or geothermal property." Sec. 1254(a)(1).

"Oil, gas, or geothermal property," by the definition in section 1254(a)(3), is only property to which any expenditure described in section 1254(a)(1)(A) is properly chargeable. Section 1254(a)(1)(A) covers the IDC election under section 263. Section 614 (which is incorporated by reference parenthetically in the definition) defines "property" very broadly. The parties agree that the working interests in each mineral lease are each separate properties and the overriding royalty interests in each of the mineral leases are each separate properties under section 614(a). Their conclusion is confirmed by section 1.614-1(a), Income Tax Regs.

The IDC costs which petitioner previously deducted and which respondent has determined must be recaptured are chargeable only against working (operating interests) and not against royalty interests. This conclusion is not in dispute. Sec. 1.612-4(a), Income Tax Regs.; *Cottingham v. Commissioner*, 63 T.C. 695 (1975).

Petitioner contends that because the IDC are chargeable only against the working interests and petitioner did not dispose of the working interests that the overriding royalties which petitioner carved out of the working interests and transferred to the trust were not "oil, gas, or geothermal property." Respondent counters with the argument that petitioner carved the overriding royalties out of the working interests and because the IDC had been charged against the working interests the properties transferred to the trust were, therefore, "oil, gas, or geothermal property." But respondent has stipulated that both before and after the transfers petitioner owned all of the working interests.

It is true that petitioner has less than it did before the transfers, but the lesser quantum of petitioner's interest is only in petitioner's right to the oil and gas produced from

the leases. The parties stipulated that the fair market value of the working interests after the carveouts of the overriding royalties was $141,837,000. When petitioner transferred the overriding royalties to the trust, it created new property interests under section 614(a). It carved out overriding royalties which had previously been in solution in its working interests. But the interests which it carved out and transferred were not working interests. It has been generally accepted by the courts for many years that nonoperating mineral interests may be separated from operating mineral interests, and, when that occurs, the new mineral interests which are created take on only the character and rights of nonoperating mineral interests, e.g., *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308 (1956); *Burton-Sutton Oil Co. v. Commissioner*, 328 U.S. 25 (1946); and *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599 (1946). The mineral interests transferred to the trust were nonoperating mineral interests and were not properties against which IDC was chargeable as required by the definition in section 1254.

After the carveout, petitioner continued to own the working interests and could exclusively continue to elect to deduct 100 percent of the IDC. The trust, as holder of the overriding royalty interests for the benefit of the shareholders, could not pass on to the shareholders any deductions for IDC because the overriding royalty interests were not operating mineral interests.

In a series of cases involving the IDC election with respect to offshore drilling platforms we have consistently pointed out the relationship between risk-taking and IDC. The Commissioner apparently now recognizes the relationship to constitute a type of analysis which he recently described as "risk analysis." Rev. Rul. 89-56, 1989-16 I.R.B. 4. We summarized some of the rationale which connected risk-taking with IDC in *Standard Oil Co. (Indiana) v. Commissioner*, 77 T.C. 349, 397 (1981), as follows:

> The argumentative justification for liberality in taxation of oil and gas is that such liberality encourages and emboldens the fiscally timid to exploit the hidden resource. It rewards the risk-taker. * * * [*United States v. Cocke*, 399 F.2d 433, 452 (5th Cir. 1968).]

The regulations do not contemplate that investors * * * [can be] allowed a deduction for intangible drilling costs without assuming the risk of the unknown result of the drilling. * * * [*Haass v. Commissioner,* 55 T.C. 43, 50 (1970).]

Thus, it is clear that risk and IDC are inextricably related. [*Standard Oil Co. (Indiana) v. Commissioner,* 68 T.C. at 350.]

The taking of risks has always been inextricably related to the availability of the IDC option. [*Gates Rubber Co. v. Commissioner,* 74 T.C. at 1477; *Sun Co. v. Commissioner,* 74 T.C. at 1510.]

More recently, we reiterated the importance of risk-taking with respect to the exploration for hydrocarbons as follows in *Gulf Oil Corp. v. Commissioner,* 87 T.C. 324, 345 (1986):

We have consistently held that IDC and risk are inextricably related. *Standard Oil Co. (Indiana) v. Commissioner,* 68 T.C. at 350. The risk referred to, however, is the general risk of exploration for, drilling, and producing hydrocarbons and that risk does not cease at an arbitrary time prior to the end of the use of the platform in the taxpayer's trade or business. * * *

Our risk analysis has been followed in *Texaco, Inc. v. United States,* 598 F. Supp. 1165, 1174 (S.D. Tex. 1984), and by the U.S. Court of Appeals for the Third Circuit in affirming our decision in *Sun Co. v. Commissioner,* 74 T.C. 1481 (1980), affd. 677 F.2d 294 (3d Cir. 1982).

In the instant case, although the facts lead to the conclusion that the leases involved are producing leases, risk continues. The owner of the working interests continues to bear the costs of operating the leases and continues to bear the duties and responsibilities inherent in the ownership of the working interest. Petitioner, as lessee, continues to be responsible for a host of duties, whether specified in the mineral leases or by virtue of the considerable body of State case law of implied covenants in oil and gas. M. Merrill, The Law Relating to Covenants Implied in Oil and Gas Leases (2d ed. 1940); 5 E. Kuntz, A Treatise on the Law of Oil and Gas (1987). These include the duty to prevent drainage from the reservoir on the leased premises by drilling wells if it appears that wells from adjoining properties may be draining the reservoir on the leased premises. Petitioner has the duty to produce from the wells as long as such production is profitable; to market the

hydrocarbon with due diligence; to seek such administrative action in aid of the other obligations under the leases; and to use reasonable care in the operations of the lease, including use of proven modern methods of development and operations. These are but a few of the duties and obligations which fall upon petitioner by virtue of its ownership of the working interests in the mineral leases.

When petitioner carved out the overriding royalty interests and transferred them to the trust, it was not relieved of any of the myriad duties and obligations which it held. Absent any Congressional intent to recapture IDC upon the carveout and transfer of nonoperating mineral interests, we conclude that it is more consistent to hold that recapture does not occur because the transferor of the nonoperating mineral interests will continue to incur IDC and the transferee of those nonoperating mineral interests will not commence to incur IDC. We recognize that recapture involves IDC previously incurred; nevertheless, it is undisputed that the only operating mineral interests, both before and after the creation of the overriding royalties, are held by petitioner.

There are no final regulations which are of assistance in deciding whether petitioner disposed of "oil, gas, or geothermal property." Regulations which were proposed were somewhat more favorable to the interpretation contended by petitioner, but the regulations were never adopted and, of course, do not represent competent authority. *Eller v. Commissioner,* 77 T.C. 934, 946 (1981).

Both parties cite one committee report to demonstrate the purpose of section 1254 and the statutory scheme which Congress enacted to bring about recapture of IDC. H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 695, 780.

The report proposes a change in the law because an oil and gas tax shelter investor could deduct IDC currently, thus deferring tax to a later time. If the oil investment became profitable, the investor could sell his interest at capital gain rates and, thus, avoid offsetting the IDC deductions by realizing ordinary income from the sale of hydrocarbons. The report also points out an abuse in the case of dry holes which is not applicable here. Respondent does not contend that the actions of petitioner in carving

out the overriding royalties and transferring them to a trust for its shareholders falls within the abuse which Congress pointed out in the committee report and, indeed, we cannot see how petitioner's actions fall within such perceived abuse. The IDC incurred and deducted by petitioner occurred during the period from January 1, 1976, through April 1, 1983, and petitioner did not dispose of any mineral interests which were taxable as capital gains.

Section 1254 closely tracks the committee report by incorporating by reference section 614. The report uses the term "oil and gas property" and defines such a property on page 90 of the report as follows:

A property is to be considered an oil or gas property only if intangible drilling and development costs are properly chargeable to that property (either in the hands of the taxpayer or his predecessor in interest). Thus, an interest in a tract or parcel of land which is not an operating interest does not constitute an oil or gas property. [H. Rept. 94-658, *supra*, 1976-3 C.B. (Vol. 2) at 782.]

The property transferred by petitioner to the trust is not "oil, gas, or geothermal property." Petitioner did not dispose of any such property. It disposed of nonoperating mineral interests which, under the terms of sections 1254 and 263 are not "oil, gas, or geothermal property."

Respondent argues that if recapture is not required the door will be opened to substantial abuse. We are convinced that our interpretation of section 1254 is correct. If the question were closer we might be inclined to interpret the section to prevent possible abuse. The opportunity for abuse is, however, slight. An innovative tax practitioner would be unable to use our opinion to avoid the application of section 1254 because Congress changed the law in the Tax Reform Act of 1986, Pub. L. 99-514, sec. 413, 100 Stat. 2085, 2227. After 1986, nonoperating mineral interests come within section 1254; therefore, IDC would be recaptured under the facts of the instant case if the disposition occurred in 1986 or later.

As to cases which are still pending, we are confident that there are adequate means available to prevent abuse if it is perceived.

Inasmuch as we have decided that petitioner did not dispose of "oil, gas, or geothermal property" in 1983, it is

unnecessary for us to consider petitioner's alternative argument as to the method for computing the amount of ordinary income to be recognized.

In order to reflect the settlement agreement of the parties, as well as the foregoing,

*Decision will be entered under Rule 155.*